**UNITED STATES of America**

v.

**Phillip R. BENNETT, Robert C. Trosten, Tone N. Grant, Defendants.**

**No. 05 CR 1192(NRB).**

United States District Court, S.D. New York.

May 3, 2007.

David Esseks, Esq., Neil Barofsky, Esq., Assistant United States Attorneys, New York, NY, for the government.

Roger Zuckerman, Esq., Aitan Goelman, Esq., Norman L. Eisenman, Esq., Zuckerman Spaeder LLP, Washington, DC, for defendant Grant.

Gary Naftalis, Esq., David Frankel, Esq., Darren LaVerne, Esq., Kramer, Levin, Naftalis & Frankel LLP, New York, NY, for defendant Bennett.

Robert G. Morvillo, Esq., Christopher J. Morvillo, Esq., Morvillo, Abramowitz, Grand, Iason & Silverberg, New York, NY, for defendant Trosten.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Defendant Tone Grant ("Grant" or "defendant") moves this Court for a severance of his trial from that of co-defendants Phillip Bennett and Robert Trosten. For the following reasons, defendant's motion is denied.

## BACKGROUND

On January 16, 2007, a third superceding indictment ("indictment" or "Ind.") was returned in which Phillip Bennett, Refco, Inc.'s ("Refco")[1] former CEO and indirect partial owner, Robert Trosten, Refco's former CFO, and Tone Grant, Refco's former President and indirect partial owner, were charged with securities fraud and other related offenses.[2] Simply stated, the indictment charges defendants with hiding the dismal state of Refco's finances by: (1) covering up proprietary losses and those of customers; (2) moving operating expenses off its books; and (3) inflating revenues. Ind. ¶ 7. This fraud was allegedly perpetrated to benefit Refco's owners and senior management upon an eventual sale. According to the indictment, as a consequence of their actions, defendants were able, *inter alia*, to: (1) secure lines of credit for Refco; (2) privately sell notes prior to 2004; (3) sell to Thomas H. Lee Partners ("Lee") 57% of Refco in 2004; (4) sell approximately $600 million of notes to the public in 2004; (5) obtain approximately $800 million of bank financing in 2004;

---

1. Refco is a commodities, securities, and futures brokerage and clearing firm incorporated under the laws of Delaware and having its principal place of business in New York, New York. Ind. ¶¶ 10, 1.

2. The initial indictment, returned on November 10, 2005, only named Bennett; the first superseding indictment, returned on October 24, 2006, named Bennett and Trosten as defendants, as did the second superseding indictment, returned on November 14, 2006.

and (6) raise $583 million through Refco's initial public offering ("IPO") in August 2005. *Id.* ¶ 8.

## DISCUSSION

Rule 14 of the Federal Rules of Criminal Procedure grants district courts significant discretion in ordering severance or other relief when the consolidation of offenses or defendants "appears to prejudice a defendant or the government." Fed. R. Crim P. 14(a). However, the Second Circuit has observed that "[t]he principles that guide [a] district court's consideration of a motion for severance usually counsel denial," *United States v. Rosa,* 11 F.3d 315, 341 (2d Cir.1993), because joint trials frequently promote efficiency by conserving judicial resources, alleviating the burden on jurors, and avoiding repetition of witness testimony in multiple trials. *United States v. Lyles,* 593 F.2d 182, 191 (2d Cir.1979). *See also United States v. Casamento,* 887 F.2d 1141, 1150 (2d Cir. 1989) ("[B]y and large, joinder promotes judicial efficiency").

In determining whether severance is warranted, courts have considered the following nonexclusive factors: (1) the number of defendants and the number of counts; (2) the complexity of the indictment; (3) the estimated length of the trial; (4) disparities in the degrees of involvement by defendants in the overall scheme; (5) possible conflict between various defense theories; and (6) prejudice resulting from evidence admissible as to some defendants, but not others. *United States v. Reddy,* 01 CR. 58(LTS), 2002 WL 1334823, at *11 (S.D.N.Y. June 18, 2002) (citing *United States v. Santiago,* 174 F.Supp.2d 16, 22 (S.D.N.Y.2001)).

Grant advances arguments under each of these factors. However, neither singularly nor in composition are Grant's arguments persuasive. As such, he does not approach meeting his "extremely heavy burden," *United States v. Friedman,* 854 F.2d 535, 563 (2d Cir.1988), of showing that a joint trial would prevent "the jury from making a reliable judgment about [his] guilt or innocence." *United States v. Stein,* 428 F.Supp.2d 138, 143 (S.D.N.Y.2006). We discuss each factor seriatim.

### I. Disparities in the Degree of Involvement by Defendants

Grant argues that the disparity of proof against him versus Bennett and Trosten is so "severely lopsided" as to militate in favor of severance. Memorandum of Law in Support of Tone N. Grant's Motion for Severance ("Mem.Supp.") at 10. We disagree.

Grant has been charged in five of twenty counts, including: playing key roles in the overarching conspiracy to commit securities fraud, wire fraud, bank fraud, to make material misstatements to auditors, to make false filings with the Securities and Exchange Commission ("SEC"), and money laundering (Count One); securities fraud relating to Refco's offering of $600 million in notes in August 2004 (Count Two); wire fraud relating to the scheme to defraud Lee in their leveraged buyout ("LBO") of Refco in August 2004 (Count Eleven); bank fraud relating to Refco's raising approximately $800 million in financing as part of the Lee LBO (Count 15); and money laundering relating to defendant's receipt of $4 million in proceeds from these frauds (Count 19). He is alleged to have committed wrongdoing as early as 1997 and as late as 2004.

Grant is alleged to have, *inter alia:* (1) assisted in covering up more than $70 million in losses resulting from the trading of customer Victor Neiderhoffer; (2) been apprised of the central mechanism of the

fraud, including round-trip loan transactions covering up large losses, and moving expenses off of Refco's books; (3) maintained an ownership of Refco, through Refco Group Holdings, Inc. ("RGHI"), of between 24.5% and 50% from the inception of the conspiracy through August 2004; and (5) given up his ownership interest in RHGI as a necessary precondition for the Lee LBO.

■ Quite simply, therefore, Grant is neither charged as being on the "periphery" of the wrongdoing alleged in this case, nor can he be considered a "relatively minor coconspirator," as he argues. Mem. Supp. at 17. Even if he were, the Second Circuit "has repeatedly recognized that joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible." *United States v. Locascio,* 6 F.3d 924, 947 (2d Cir.1993).

Defendant's citations are clearly distinguishable. *United States v. Gilbert,* 504 F.Supp. 565, 571 (S.D.N.Y.1980), is largely inapposite, as Grant is plainly neither "lately come to the venture" nor an "innocent dupe." *Id.* at 566 and 570 (citing *United States v. Kelly,* 349 F.2d 720, 759 (2d Cir.1965), *cert. denied,* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966)). Nor does this Court's decision to sever specific *counts* in *United States v. Villanueva Madrid,* 302 F.Supp.2d 187 (S.D.N.Y.2003), provide support for defendant's argument. There, the severed laundering trial involved evidence connecting defendant to a corrupt politician and a powerful, violent narcotics cartel, while the fraud charges involved a scheme which injured no one. *Id.* at 191. Lastly, *United States v. Upton,* 856 F.Supp. 727 (E.D.N.Y.1994), involved 13 defendants and 29 counts, and substantially less overlap in the proof to be offered at trial for the two different sets of defendants. *See, e.g., id.* at 736 ("None of the Atlanta defendants are charged with substantive violations alleged to have occurred at JFK.").

■ Additionally, as we have noted, "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Columbo,* 418 F.Supp.2d 385, 389 (S.D.N.Y.2005) (quoting *United States v. Scarpa,* 913 F.2d 993, 1015 (2d Cir.1990)). Nor is this a case in which "the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant that severance is required to prevent unacceptable spillover prejudice." *United States v. Spinelli,* 352 F.3d 48, 55 (2d Cir.2003) (cited at Reply Memorandum of Law in Support of Defendant Tone N. Grant's Motion for Severance ("Reply") at 8). Rather, any potential conflict in the instant case could be readily cured by the use of limiting instructions. *See, e.g., Zafiro v. United States,* 506 U.S. 534, 540–41, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) ("even if there were some risk of prejudice, here it is of the type that can be cured with proper instructions, and juries are presumed to follow their instructions.") (internal citation and quotation omitted).

## II. Antagonistic Defenses and "Consciousness of Innocence" Evidence

■ Grant asserts that his defense and that of Bennett and Trosten will be antagonistic to the point that severance is required. Specifically, according to his motion papers, Grant plans to argue at trial that "he was wholly unaware of the phony transactions and massive accounting fraud allegedly perpetrated by Mr. Bennett and Mr. Trosten," and that he himself was a

victim of their fraud.[3] Mem. Supp. at 14. To demonstrate Grant's "consciousness of innocence" regarding the alleged fraud, defendant intends to proffer evidence that at the time that he produced a hand-written note of his to the government in response to a subpoena from the SEC in August 2006, he already had formed the belief that: "Mr. Bennett was guilty; the case Bennett was extremely strong; Bennett would be convicted; [and] Bennett, and anyone convicted alongside him, would spend many years in prison." *Id.* at 14–15. He further seeks to admit evidence that he "had read the charges against Mr. Bennett; he had consulted with his attorneys about the criminal case; and he had been exposed to a significant amount of press coverage of the case against Mr. Bennett." *Id.* at 18–19. Grant assumes that his co-defendants' likely defense will be that their transactions were "open and notorious," thereby "clearly mak[ing] it harder for Mr. Grant to persuade a jury to acquit him." *Id.* at 15.

We are not persuaded that Grant's planned defense is so antagonistic to that of Bennett and Trosten as to warrant a severance. The Supreme Court has squarely held that mutually antagonistic defenses are "not prejudicial *per se.*" *Zafiro*, 506 U.S. at 538, 113 S.Ct. 933. Rather, severance is appropriate when "acceptance of one party's defense would tend to preclude the acquittal of the other." *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir.1998). Here, the level of conflict does not strongly militate in favor of—let alone require—severance; "an adversarial stance by a codefendant clearly does not, alone, require trials to be severed." *Unit-*

*ed States v. Cardascia*, 951 F.2d 474, 484 (2d Cir.1991). Rather, "the defenses must conflict to the point of being so irreconcilable as to be mutually exclusive before we will find such prejudice as denies defendants a fair trial." *Id.* (citing *United States v. Villegas*, 899 F.2d 1324, 1346 (2d Cir.1990)).

Grant argues that this consciousness of innocence evidence is essential for him to "demonstrate the fundamental implausibility that he acted with criminal intent," Mem. Supp. at 19, because "a guilty person would not have turned these over to the government knowing that the government could easily prove the existence of a conspiracy." Tr. at 14. However, at oral argument, counsel for Grant acknowledged that Grant's then-counsel had knowledge and possession of the notes in question before they were turned over to the government in August 2006 pursuant to the SEC subpoena. *Id.* at 10. As such, as this Court observed at oral argument, Grant's "choice" in turning the notes over "evaporates when once the lawyers have them" because "they cannot participate in an obstruction of justice by permitting him at that point to destroy the notes or not turn them over." *Id.* at 15.

Grant is thus left to argue that "before he even turned [the notes] over to his own lawyers [he] had read the indictment, and had discussions, and had read the newspaper articles about Mr. Bennett's bail argument"—that is to say, the fact that Grant turned over these notes *to his lawyers* is evidence of consciousness of innocence. *Id.* at 16. We are not persuaded by this argument. Grant might well have turned over these notes—contained in a few boxes

---

**3.** As part of his claimed victimhood, Grant argues that he plans to introduce evidence of a claim he made in the pending Refco bankruptcy proceeding which demonstrates that "he had been misled by representatives of Refco and others." Mem. Supp. at 15–16. At

oral argument, however, Grant's counsel conceded that this action was "just a third-party claim," as Grant himself was the subject of a pending civil suit. Transcript of Oral Argument Held on April 23, 2007 ("Tr.") at 9.

of disclosures, *see Id.* at 13—to his counsel not knowing "how the government would read these notes," *Id.* at 7, or not fully comprehending that the disclosure of his notes to his lawyers would result in their production if a subpoena was issued at a later date.

Thus, though we explicitly reserve an evidentiary ruling on this matter for a more appropriate time, we find it sufficient for our purposes here to state that we believe that Grant would not be prejudiced in advancing this defense if he is able to argue that: (1) he knew that Bennett had been arrested and indicted; (2) he knew of, and had read, the "lengthy" indictment against Bennett; and (3) the charges against Bennett were serious. We fail to see the relevance either of Bennett's bail conditions—Bennett, after all, is not a citizen of the United States—or of Grant's purported conversations with his then-counsel regarding the indictment against Bennett.

Moreover, evidence of Grant's state of mind before he turned over these notes would necessitate his testimony, and defense counsel candidly stated at oral argument that they "can't provide any assurances" as to whether Grant will testify. *Id.* at 10. We are unwilling to construct any justification to sever on so shaky a foundation.

On these facts, then, it is plainly untrue that "in order to accept the defense of one defendant, the jury must of necessity convict a second defendant." *Cardascia,* 951 F.2d at 484. Additionally, we believe that any conflict in the instant case could be remedied by the use of limiting instructions. *See Zafiro,* 506 U.S. at 540–41, 113 S.Ct. 933.

### III. Evidence Only Admissible as to Some Defendants

■ Grant proffers two evidentiary-based arguments in support of his motion for a severance. Neither warrants the relief sought. First, Grant asserts that the government's planned introduction of a statement made by Bennett to one Santo Maggio, a coconspirator expected to testify at trial, will be inadmissible against Grant because it does not amount to a statement in furtherance of a conspiracy under Fed. R.Evid. 801(d)(2)(E). Specifically, Bennett purportedly told Maggio that he had met with Grant and had given him certain information regarding the Lee LBO that demonstrates that "Grant and Bennet[t] were in it together." Government's Memorandum of Law in Opposition to Defendant Grant's Motion for a Severance ("Opp'n") at 26.

It is not clear that the statement is inadmissible. While we reach no final decision on this record, as the issue is more properly resolved in the context of an *in limine* motion, the statement appears to be one that "inform[s] [coconspirators] as to the progress or status of the conspiracy," which is admissible under this hearsay exception. *United States v. Gigante,* 166 F.3d 75, 82 (2d Cir.1999). To the extent that it is inadmissible against Grant, it would be equally inadmissible in a severed trial, and thus does not factor into a severance analysis.

■ Second, Grant contends that he would "suffer through the long, steady drumbeat of evidence of Mr. Bennett's and Mr. Trosten's alleged financial and accounting chicanery" in a joint trial. Mem. Supp. at 17. Such a result, he argues, would be inconsistent with caselaw which suggests that even though acts and statements by one coconspirator in furtherance of the conspiracy are properly admissible against all the members of the conspiracy, "relatively minor coconspirators" can be "prejudiced by the disparity of evidence in

a joint trial." *Id.* However, as discussed *supra,* based on the allegations in the indictment, Grant's role is not that of a minor player. Moreover, to the extent that a category of evidence is irrelevant to Grant, a limiting instruction will suffice to remove any prejudice. *See Zafiro,* 506 U.S. at 540–41, 113 S.Ct. 933.

## IV. The Number of Defendants and Counts and the Complexity of the Indictment

■ We need not discuss the number of defendants, which, at three, Grant admits is "not an unreasonably large group of defendants to try together." Mem. Supp. at 20. Instead, Grant focuses on the number of counts and the alleged complexity of the indictment, portraying it as "fifty-four pages long" and citing "a dizzying array of statutes". *Id.* Though he argues that it would be "difficult to conceive a case with a more complicated set of facts, and legal, financial and accounting concepts than this one," *id.* at 21, we are confident that this case is not one involving "esoteric theories of law and complex business transactions beyond the ken of the ordinary juror." *United States v. Moten,* 564 F.2d 620, 627 (2d Cir.1977). Indeed, juries in this district and others routinely decide complex cases involving securities fraud, and Grant has made no showing as to why this case is notably more difficult in any respect. Additionally, Grant, according to the indictment, does not stand on the periphery of the scheme.

Nor have the scales of justice, currently weighed by the load of three defendants and twenty counts, been so impermissibly tipped to the point where the "resultant complex trial record [would make] it [too] difficult for a jury to keep straight the specific evidence and charges against each defendant." *United States v. Gallo,* 668 F.Supp. 736, 749 (E.D.N.Y.1987) (granting severance in a 14 defendant, 22 count case on grounds that the indictment was "far too extensive and intricate to expect that a jury would be able to discern the myriad of subtle distinctions and mental gyrations that would be required by the inevitable plethora of limiting instructions necessary.").

## V. The Estimated Length of the Trial and Concerns of Judicial Economy

■ Grant concedes that the government's estimate of four to six weeks for their case-in-chief, even if inaccurate, does not approach the four-month benchmark for severance set by the Second Circuit in *Casamento,* 887 F.2d at 1152 (holding that "where the judge determines that the time for presentation of the prosecution's case will exceed four months," the government should present sufficient reason to "support a conclusion that a joint trial of all the defendants is more consistent with the fair administration of justice than some manageable division of the case into separate trials for groups of defendants.").

Nor does Grant "purport to be able to assure the Court that its overall trial time will be less if the Court severs him." Mem. Supp. at 22. Rather, his argument is, essentially, that trying him alone would be "relatively short" and that the resultant trial of Bennett and Trosten would be reduced "by some, presumably modest, amount." *Id.* at 23. We cannot agree with the former proposition. Instead, we accept the government's position that a great deal of evidence would be repeated in each trial. In addition, we reject Grant's contention that his own trial time could be severely minimized—and the evidentiary overlap diminished—by defendant's proffered stipulation of acknowledgment of the existence of a conspiracy between Bennett and Trosten. *See* Mem. Supp. at 23; Reply at 13–14.

## CONCLUSION

In sum, because Grant has "not approached a showing that a joint trial would prevent a jury from making a reliable judgment about his guilt or innocence," *see Stein,* 428 F.Supp.2d at 143, his motion is denied.

**IT IS SO ORDERED.**